# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| CAROL GODBOUT, )<br>an adult individual resident of Augusta, )<br>County of Kennebec, and State of Maine )<br> )<br>　　　Plaintiff )<br> )<br>　　　v. )<br> )<br>CITY OF AUGUSTA, )<br>a Municipality in the County of Kennebec, )<br>and State of Maine, )<br> )<br>　　　Defendant ) | CASE NO. _____ |

## COMPLAINT AND REQUEST FOR JURY TRIAL

NOW COMES the Plaintiff, Carol Godbout, and makes the following complaint against the City of Augusta.  She requests a jury trial.

## Parties

1.　　　Carol Godbout is a female citizen of Augusta, Maine.

2.　　　The City of Augusta is a duly organized entity of local government under Maine law.

3.　　　The City and its Civic Center are a "public entity" as defined by 5 M.R.S.A. § 4553(8-C).

## Procedural background

4.　　　This is a proceeding for declaratory and injunctive relief and monetary damages to redress the deprivation of rights secured to plaintiff by the First, Fourth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983 and § 1988, the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, (hereinafter "Title VII"), which prohibits discrimination on the basis of gender, Sections 4 and 6-A of Article

I of the Maine Constitution, and the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.*

5.     On July 15, 2013, Godbout filed a complaint of discrimination with the Maine Human Rights Commission ("MHRC").

6.     More than 180 days having passed, the Commission issued a right to sue letter on August 22, 2014, pursuant to 5 M.R.S. § 4612 and § 4622.

7.     On October 2, 2013, Godbout served notices of claim on the City pursuant to 14 M.R.S.A. § 1602-B and § 8107

8.     As of November 5, 2014, the parties entered into a tolling agreement.

## Jury demand

9.     Plaintiff Godbout demands trial by jury of all claims to the extent allowed by law.

## Factual background

10.     In September 2002, Godbout began working for the Augusta Civic Center.  She was hired by a director who is no longer there.

11.     At the time of the most harassment, Dana Colwill was the Executive Director of the Civic Center.  Godbout worked in the kitchen as a chef.  Matt Towle was the Executive Chef. David Glover was the Food and Beverage Director.  Earl Kingsbury was the Major Events Coordinator and eventually became the Assistant Center Director to Dana.  Mike Coyne was "First Cook".  Godbout's position was Cook.  Coyne and Godbout were on the same level but he had more seniority.

12.     From 2002 to 2012, there were years of comments like:

- Clean this or that, that's why we hired you; to pick up after me.  That's all women are good for.

- You don't have to listen to her, she's not even really a cook.

- Women belong in home kitchens not in commercial kitchens.  Women couldn't handle it.

- "Wench" or "dyke".

13.   In February 2012, Coyne began to get agitated because Godbout was scheduled to do certain tasks that he had done before or believed he should be doing.  He did not feel that women should have a place in a commercial kitchen.

14.   In contrast to how he treated the men in the kitchen, he would make demeaning remarks to Godbout, the one woman cook, such as, "how long have you been here?  You should know these things," or "women do not belong in the kitchen.  If you know what you are doing, why don't you go out with the rest of the split tails?"  Coyne did not put the men down.

15.   Godbout talked to Matt Towle and David Glover several times about Mike Coyne's differential treatment of her.  Nothing was done about it.  They would say something like, that's just Mike, or that he was just grumpy or Mike is going to retire soon.

16.   In April 2012, Dana Colwill got upset with Godbout about a vacation week she was scheduled for.  It was a time that David Glover had assigned to her!  Unlike the men, Godbout had to give Dana a copy of the note with that date on it that she had received from David.  Vacation time was not an issue for the men in the kitchen.  For example, Matt Towle took vacation all throughout the year and didn't need it specially approved like Godbout did.

17.   The men in the kitchen made medical appointments, went to them, came back and were allowed to make up time missed.  They weren't forced to take vacation/sick time.  David Glover made Godbout, in contrast, take a whole day off if she told him she had a medical appointment.  She also was not allowed to make the time up.

18.     The anti-female, gender-stereotyping, and anti-sexual orientation discrimination and harassment continued full force.  It was pervasive, accepted by management, and offensive.  As one of the other female workers observing this conduct put it:

> Often the male kitchen staff would talk down to her and/or about her behind her back.  I had first hand experience with Micheal Coyne's(one of the cooks),perceived opinion of Carol's sexual preferences.  I was prepping some vegatables when Mike approached me and started talking trash about Carol.  He asked me if Carol was a "carpet-licker".  I stared at him, shocked at his blunt statement, since there were other women waitstaff present.  He started to say more, but I cut him off, stating that he was way out of line.  He was often making lewd remarks that were way over the top such as " The nuns must be missing this", while holding a large cucumber or carrot.  He would finish this remark with "You know, Carol used to work for the nuns".  Then he would

19.     Stereotyping nuns as needing and missing a male penis made a gender based assumption that women to be women need a penis.  The comments about "carpet lickers" was aimed at putting down Godbout because of her orientation.  The statements were violations of the law for different but equally offensive reasons.

20.     On December 6, 2012, when Godbout arrived at work, she overheard part of a conversation between dish washer (utility man Alex Hall) and Mike Coyne.  When she asked Alex about the conversation, he responded "Mike Coyne really hates you, Carol."  He went on to tell her that Mike was obsessed with her sexual orientation.  Mike frequently called her "carpet muncher" and "muff diver."

21.     A second utility worker (Nick Gagne) told her that Mike had asked him, "do you think if I bought the book 'Clit Licker 101' she would autograph it for me?"  These young men were under Godbout's supervision and she was greatly distressed about this situation.  This conversation took place in front of several other workers.

22.     Linda Dyer, bar manager, wanting to make sure that Dana Colwill was advised of this situation, went to her manager (Earl Kingsbury) and office manager Betty Bell, to be sure

4

that Dana was told. *This was the first of a series of reports of harassment for which there was no remedial action, let alone a prompt or appropriate one.*

23.     On December 8, 2012, Godbout went to David Glover and told him what Mike Coyne had said. He said he would go to Dana Colwill and discuss it with him and see what he wanted to do with it. *This was now the second report about Mike's sexual comments about Godbout and nothing had been done yet.*

24.     Linda Dyer, the bar and concession manager, went to Godbout and said she had told her boss, Earl Kingsbury, about what Mike had said. She had also told the office manager.

25.     After that, Godbout became targeted for retaliation for having reported on Mike Coyne, in addition to the gender harassment. For example, a dinner that she was responsible for was nearly ruined because Matt or Mike didn't take out the main meal (lasagna) ahead of time to thaw, and the meal wasn't listed on the executive chef's notes in the kitchen so that she didn't know about it. The clipboard of meal notes that she used to double check the executive chef notes (plan from the event coordinators) against was missing. Godbout needed this to check that clipboard to make sure there had been no changes. In this case, the clipboard was missing altogether. The lasagna was therefore not ready to serve with the meal and David Glover became angry with Godbout, *not the males*, including the male cooks who were responsible for the prep and the omission on the note. The retaliation included direct interference with her ability to do her job.

26.     Also after the reports about Coyne on Dec. 6 and 8, Mike Coyne stopped talking to Godbout. It wasn't that he became more quiet or reserved; he would just walk by her. Even when they needed to talk to do their job, he refused. For example, when the two of them were working on a meal, he would pretend she wasn't there. As a result, she couldn't tell what he had already done for a meal. He wouldn't tell her what he had already prepped.

27.     When Godbout reported this retaliation to Matt Towle, and said that she couldn't do her job without communication with her co-chef, Towle said, that's just Mike; just overlook it.  He refused to stop the retaliation.

28.     Mike Coyne also now glared at Godbout throughout the day.  When she talked to him, he just stared at her and didn't respond.  If she asked him something such as where is the chicken, he just shrugged and made a scoffing sound but would not answer her.

29.     On Dec. 10, 2012, Mike Coyne went to David Glover to complain about Godbout being on her cell phone, trying to get her in trouble.  What he didn't tell David was that one call was from a waitress who couldn't get through the house phone to get her hours off the schedule and that the other call was a personal one that Godbout had gotten permission from the Executive Chef, Matt, to make.

30.     In contrast, that afternoon, Mike Coyne was on the house phone on personal calls twice and nothing was said about that.  Godbout though DID get reprimanded by David Glover for taking the call from the waitress about work.

31.     About a week later after December 8, 2012, Godbout went to Manager David Glover again to ask if he had talked to Mike about his harassing behavior.  He told her he hadn't had a chance to because of the holiday.

32.     During the week of January 14, 2013, Godbout went to Glover again to ask if he had addressed anything with Mike.  He told her he had been "right out straight" and would take care of it as soon as he could.  In the meantime, Mike Coyne was retaliating against Godbout and no one from management was telling him to stop.  *It was now over a MONTH since Coyne's comments about clit-licker and other derogatory terms about lesbians had been reported to the City management.  The City had done NOTHING.*

33.     During the week of the Martin Luther King holiday, Matt got 35 hours of OT; on the MLK holiday, he was scheduled for OT.  Godbout got none.

34.     On February 5, 2013, Godbout spoke to Executive Director Dana Colwill on the phone.  Godbout asked Colwill what the status was with the issues with Mike Coyne.  There was a big pause.  After that, Colwill stated that the issue had been referred to Kristy Gould in HR and that she had noted it and was monitoring the situation.  *This statement was a lie – by the City's Executive Director of the Civic Center.*

35.     Immediately after hanging up with Colwill, Godbout called Kristy Gould.  Gould said she didn't know anything about the harassment by Mike.  HR Director Kristy Gould asked Godbout to come in and see her to talk further about issues with Mike.

36.     It was February and it was TWO MONTHS after Godbout had complained about Mike and still nothing had been done!!!   Nothing happened to David Glover for not dealing with Mike Coyne either.  Godbout later learned that the City Manager had taken the position that David was retiring in July anyway so just let it ride.

37.     On February 7, 2013, Godbout met with Kristy Gould for approximately an hour to discuss Mike and the issues with the Civic Center's upper management, David Glover and Dana Colwill.  Godbout also reported to HR that she had overheard Mike Coyne telling one of the dishwashers that she was a "carpet muncher".  She reported all the details about the "if I bought the book 'clit licker 101' would she would autograph it for me?" comments.  Godbout also reported that it had gone on a long time, making it hard for being a woman in that workplace, that she was always an outcast, that she didn't count when it came to getting equal overtime and weekend work time, and that she had been harassed for a long time.

38.     Godbout also reported to HR that she had asked David Glover a number of times about what he was going to do about the Mike situation and nothing happened and that he was

giving overtime to the male workers but not to her, the one woman.  Unlike the guys, she was excluded from conversations about meals and changes made for the day; at the same time, any information that was pertinent to the function of the day she was held accountable for knowing. The men would meet without her daily on the landing outside or in the manager's office.

39.    Godbout also reported the long history of gender based harassment and discrimination at the Civic Center.  For example, she explained:

- that she was called a "dumb fucking woman" by Mike Coyne;

- how difficult it was for her to make medical appointments because, unlike the guys, she was limited to certain days and times;

- that she was reprimanded for going to the bathroom too often and for too long, even though she had a medical excuse and doctor's letter also for being at her locker (when she needed to get her meds).  David called these things wandering when she did it.  THE MEN however, have different rules.  Godbout explained as an example that Mike C. was allowed to read the paper for hours right in front of David,  Matt would be on the computer looking at cruise information (right next to David), and Denis was often in the office for long periods of time shooting the breeze with David & Matt and NOTHING WAS SAID TO THEM;

- How the schedule accommodate the males' out of work activities but not Godbout's;

- how Matt had gotten way more comp time (OT) and the answer she got was that it is seniority.  Yet now Denis, low man on the totem pole, was getting it and she was overlooked and the ONLY staff person and female instructed not to get overtime.  In other words, the seniority rule disappeared the minute it gave her, the female, any advantage;

- How it was a continuous problem for her to schedule or keep medical appointments and how she was NOT allowed to make time up, unlike the men.

40.    Finally, Godbout and HR discussed having these allegations investigated and Kristy Gould asked who should be questioned.  The ONLY person she suggested who was questioned in the end, though, was Cathy and the Management team, no one else.

41.     Godbout followed up with a letter to Kristy Gould of HR on Feb. 8, 2013.  She reported her many years of being discriminated against and told HR that she wanted to follow up with her complaint to them about it.

42.     On February 14, 2013, because Thursday was David and Dennis's bowling night, they left early.  David scheduled Dennis and himself until 6.  Godbout had to stay until 8:45 p.m. to finish all the work.  She was scheduled until 8 pm – this was after she pleaded with David to take her off being scheduled until 9.  But this was not OT:  David was scheduling her no overtime but, at the same time, scheduling her when he knew she needed to go to a second job, one she needed to make ends meet.  In contrast, he scheduled around the men's personal schedules like bowling and their own part-time jobs and activities like gardening and snow-plowing.  For example, Matt plowed in the winter and gardened in the summer and Dennis, aside from bowling, had another job at a summer camp and ski resort in the winter.  The men always seemed to be accommodated for these extra jobs.  Godbout was not.

43.     Godbout continued to be singled out and excluded from conversations about meals and daily schedules; the men met on the loading dock or in David's office regarding these issues.  *This was after her report of gender discrimination to HR.*

44.     As another female worker put it:

> In the mornings the male cooks would gather on the loading dock or David Glover"s office to make the day's plan.  Carol was never included in these meetings.  She seemed to always be left out of the loop.  They did not want to give her even the information needed to successfully perform her job.  There was even a joke going around about the "secret squirrel society".  Everyone was aware that the male cooks deliberately kept Carole ill-informed.  The other cooks would give her menial jobs like peeling large amounts of vegetables, eggs; any tasks the other cooks didn't want to be bothered with.  Even the assistant cooks would hand off jobs to her, even though she has much more culinary experience.  Many times, she would be sent to work with the waitstaff, or giving her cleaning assignments.  This was never done with the male cooks.

45.     Around February 2013, Mike Coyne retired.  After that, things got worse and not better.

46.     On March 1, 2013, Godbout received a letter from Kristy Gould in HR, dated February 28, telling her that the claims of sexual orientation harassment by Mike were corroborated but that her complaints about gender discrimination by David and others were not and that all HR could see was that there was "conflict" between her and David.  The letter also only dealt with her complaint of unequal treatment regarding medical appointments and failed to address the other issues she had raised in the meeting on Feb. 7 about how she was treated differently from the male cooks.

47.     HR had not spoken to other women who could have corroborated what was happening to her.  A number of them could have corroborated gender discrimination by the male workers, including Manager David Glover, and that it was NOT "just a conflict":

> Carol was treated by a much lesser standard than the men. She would be given tedious, lowly jobs, even making her do prep work for the assistant cook instead of the other way around. It seemed like they were always trying to chip away at her spirit. It was pretty commonly known that they wanted her to quit so Denis the assistant cook could have her full time position. She was constantly made to feel unwanted in the kitchen and sent to work with wait staff. While the men were preparing food she would be setting tables or chopping veg. and fruit. One day I heard one of the cooks  tell her" We don't need you out here, go work with the other split tails where you belong". You could hear the other men snickering. Often there was rude and demeaning

48.     On March 2, 2013, Matt Towle was really angry at Godbout about Coyne retiring. He threw a box weighing 22 pounds at her.  The men in the kitchen were angry about Mike's leaving.  Things were very tense.

49.     On March 4, 2013, Godbout wrote to Kristy in Human Resources a letter telling her things were really awful and she felt that she was being retaliated against for Mike leaving, including a number of physical and threatening acts.  She reported the box being thrown at her and the Executive Chef slamming boxes.  *HR made no response to this report.  The City took no remedial action at all, let alone any prompt or appropriate remedial action.*

50.     Director David Glover also retaliated against Godbout for reporting Coyne's conduct by making her schedule harder on her and making comments like, "well, Mike's not here anymore so I guess YOU will have to do it."

51.     On March 5, 2013, Tuesday, Godbout noticed serve save books on David's desk. She asked if they were going to take the test.  David, answered yes, the test will be on Thursday. She asked if they were going to take a class first.  He answered "no, there will just be a test." Godbout asked if they could have the books then.  If she had not seen the books on his desk, it isn't clear she would have received one to prepare for the test.  He also commented that they had to pass the test to work in the kitchen.  They all passed the test except Dennis.  Then, it seems that the rules changed.  You no longer had to pass the test to work in the kitchen.

52.     On March 7, 2013, Glover held an employee meeting.  They were told at this meeting that Mike Coyne had retired.

53.     The retaliation for reporting the harassment continued to get worse.  On April 2, 2013, Godbout was called into David Glover's office.  He told her that she had punched out late 9 out of the last 10 days ranging 3 to 20 minutes each time.  Prior to going to HR about harassment, Director Glover had supported her working a little late as necessary rather than leaving anything undone in the kitchen.  Now, however, he insisted that, from then on, she was to leave right on the minute.  She said she would do the best she could.

54.     This instruction by Director Glover singled Godbout out from the male workers. The guys were not called in as Godbout was nor was the same rule applied to anyone but Godbout.  She tried to approach the Executive Director, Dana Colwill, about this matter and he told her that he had instructed David to tell her that she was NOT to stay overtime and he walked away from her dismissing any further discussion of this.

55.     Godbout also tried to talk to the Major Events Coordinator, Earl Kingsbury, about this and he would respond with that he would check the time cards.  For several weeks, Godbout kept track of all the cooks' hours.  Both Matt and Dennis got considerable overtime and Godbout was told to punch out "on the hour" and not to be ONE MINUTE over!  She was falsely told that the reason for this was it was a logistical nightmare for payroll with punching out after the hour yet, when she checked all the time cards in the rack, almost EVERYONE had punched out after the hour, contrary to the rule imposed just on Godbout.

56.     On April 26, 2013, Godbout reported that a steamer needed for large gatherings was not working.  Director Glover responded in an angry manner that, if she did things "the way the men did," then there would be no problem.  He went on to say that he did not believe anything was wrong with the steamer at all.  Earl Kingsbury was sitting in the office during this conversation.  He said that he, himself, had had problems the past weekend trying to heat soup in that steamer.  Later in the day, Godbout learned that David had called the repairman to check the steamer.  The steamer, in fact, needed repair.  That night, several of the kitchen employees went to Godbout to tell her that Matt, Dennis and David had a meeting in the kitchen (where everyone could hear), complaining about her.

57.     On April 30, 2013, David Glover came into the kitchen and had a loud conversation with Matt about the upcoming Saturday.  This was very unusual.  These meetings usually took place where no one could hear them talking.  He then spoke to Dennis and said, "I will have to have you come in on Saturday (May 4); that will make 6 days you will work this week – so it will be overtime."  He looked at Godbout, smiled, then walked away.  There was plenty of time that week to adjust the schedule to offer her the overtime.  But, once again, the overtime was given to the male workers and not her.

58.     On May 7, 2013, Hammond Lumber Day – Godbout arrived at work around 11:00 a.m.   They had to do 6,000 appetizers and a 3 entrée meals for 550 people.   A few minutes after she arrived, Matt handed her a list that said crab cakes, pineapple sauce, gravy and vegetable.   He said that he and Dennis would do the rest.   A few minutes later, she heard him tell Dennis that he would be back asap and he left.   She then asked Dennis where Matt went as it seemed odd that he would leave in the middle of such a large function.   Dennis said Matt had a doctor's appointment.   She also had a doctor's appointment this week but David had ordered her to change it, as it was too busy that week.   Later David came out of his office and announced that Matt would be late in returning and, in fact, may not return at all as his doctor had had an emergency.   She asked if they/we were going to continue with the original game plan and if not, what could she do to help.   Neither David nor Dennis responded to her question.   Several times she asked Dennis if she could help him, and he just ignored her as if she didn't exist.   Dennis would not accept Godbout's help even though the food was being overcooked and burned because he could not keep up with all the ovens.   That night, David, Matt and Dennis were overheard in the kitchen telling Earl that she did little to nothing all day and refused to help Dennis!   Earl never asked her what her side of the issue was.

59.     On May 9, 2013, Godbout drove into the parking lot at work.   As she pulled into a parking space, David Glover was looking into the car in the next space and was bent over.   He quickly stood up and looked startled.   When they got inside, he made the comment that he thought she was going to run over him and he called her a "***crazy bitch***."   The only witnesses to this were the other men in the kitchen.   Everyone laughed.   Godbout's manager called her a "crazy bitch" in front of other staff.

60.     Later on May 9, around 6 p.m., David came to her and demanded to know where all the carrots were.   She stated that, as far as she knew, they were put in the warmer and taken to

Fort Western.  He kept asking her if she was certain if she had cooked them and where they were.  Then he wanted to know how many she had cooked and she stated 8 full pans, two for ACP and 6 for Fort Western.  He asked how many cases that was and Godbout replied four.  He asked 20# cases?  And she said yes.  He then started to holler "well that's not enough, that's only 320 servings and we have over 700 people to feed."  She said that was all that they had and she had already discussed it with Matt and if they ran out he was going to back it up with green beans.  Glover kept hollering that there was not enough.

61.     Godbout left her carving position at 6:55 p.m. and went to the kitchen to put her forks away so she could leave.  She was scheduled to work until 7 p.m.  Glover approached her and stated "I want you to stay and clean the kitchen."  She said, "Dave, I have to go to my other job.  This is a little short notice to call my boss."  Again he started hollering and said, "I don't care about that.  You have bailed on us every night for the last two weeks and left Dennis to clean the kitchen."   Godbout replied, "David, I do as much as I can before I have to punch out.  Remember you specifically told me I was not to get ANY overtime, not even one minute."

62.     Godbout had not been allowed to stay a minute late but suddenly, because it was "bowling night," he insisted that she stay and accused her of leaving them high and dry for weeks.  (This command of his was directly contrary to not just what he had warned her about on April 2 but counter to what the Executive Director of the Civic Center had told her as well.)  David then became very angry and started to shout and said, "that's not what I meant and you know it!"  Godbout then said, "I think we should have this conversation in Dana's office."  He replied, "all right we will!"  She suggested Dana Colwell's office since this issue involved a directive from him as well.

63.     She then exited his office and he continued following her from room to room hollering and accusing her of insubordination.  Godbout went to the kitchen and he followed her

14

and stated that he was off tomorrow and she said ok we will do it Monday.  As Godbout was picking up the kitchen, David was hollering (and many employees heard him) ranting something about insubordination.   She began having chest pains during this altercation.

64.     Godbout first told Earl when they were talking in the North Wing that she was having chest pain but she formally reported it to Kristy on the afternoon of May 10, 2013, after she went to the doctors.  Kristy told her that she had gotten a copy of the letter that she had given to David Colwell, describing the night before.

65.     On Friday, May 10, 2013, Godbout came to work.  No one spoke a word all morning.  Godbout prepared the meal and Dennis did some cleaning.

66.     Godbout had made a doctor's appointment to have the chest pains checked out. During her doctor's appointment, her doctor took her out of work for sick leave.  She had her doctor send a note to Kristy Gould in HR so she would know what was going on and tell folks like Dana.  The chest pains have required a series of tests and appointments with cardiologists.

67.     After a lot of tests and doctor's appointments, it appears that there was nothing wrong with her heart and the chest pains were caused by stress at work.

68.     On June 24, 2013, Godbout returned to work from medical leave and was immediately brought into a meeting with the Civic Center Executive Director, Dana, and Kristy Gould of Human Resources, and handed a letter that stated that she had gotten into an argument with David right before she left and was equally responsible.  It falsely said that she had screamed and yelled around other employees.  They made this determination without ever talking to Godbout and doing an investigation.  They appear to have only spoken to the men who were harassing her.  This negative letter went into her personnel file.

69.     On June 28, 2013, Godbout wrote a response to this letter and also once again reported harassment to management.

70.     In or around June or July of 2013, Augusta hired Tracy Thompson as a replacement for Director Glover, who had retired.

71.     It was at this point that gender stereotyping comments about Godbout started up again in earnest, in addition to comments about her sexual orientation, which had been worse before when Mike Coyne was still working.  This time, though, the worst came from Godbout's own direct boss, Tracy Thompson, the new Director at the Civic Center.

72.     As another female employee explained it:

> At this point, Carol hoped that things would get better. It did not turn out this way. Tracy Thompson, the new Kitchen Manager, just carried on with the hateful treatment of Carol. She used to tease her about her unwomanly hairstyle, mannerisms, and appearance. Even going so far, as making vulgar remarks like *Eating at the Y*. Then, would just say she was kidding around. At times, it would even make me angry as Carol always gave her all and did not deserve this treatment.

73.     Male employees also witnessed the differential treatment of Carol and believed it to be based on gender and orientation.  As one wrote:

> I have worked at the Augusta Civic Center for several years. I started at 16 yrs.old as a pot boy and concession worker and I am now a part time Assistant Cook. Many times I have overheard other cooks as well as David Glover publicly trashing Carol behind her back.  They criticize her abilities, use of sick time saying she is bleeding FML, her frequent bathroom visits as well as her sexual orientation.
>
> Carol is the Only female cook in the kitchen and they treat her very badly.  For

74.     Tracy Thompson, Director, told Godbout that she should take Godbout to the beauty school for a perm to "soften [her] up" or "make [her] more girlie."  Director Thompson said this in front of a lot of people at work.  She also started and allowed talk about Godbout wearing a hat instead of a hairnet.   Thompson made comments such as that Godbout was "just trying to fit in with the boys, ha ha," or "What's the matter?  hair nets too fem for you?"  Linda Dyer overheard Tracy Thompson making comments to Carol like taking her to her hairdresser and making her look more like a woman.

75.     One morning, when Godbout went into Thompson's office, she was eating a candy bar.  Godbout, thinking it was an odd thing to have for breakfast, said "You are eating that this early? why?"  She just grinned and said, "oh, but that's your job to eat at the Y."   Godbout was very embarrassed and just left the office.  Eat at the Y is urban slang for oral sex on a female, with the Y representing the silhouette of a woman with her legs spread.

76.     Employee Linda Dyer reported the "eating at the Y comment" to HR (Kristy Gould) because Thompson came out and told her and another worker that she had made the comment to Carol and said that's why she thought Carol was upset with her.  *Despite being on notice of this kind of talk to Godbout, HR took no action!*

77.     In September 2013, Godbout reported continued issues with Dennis, one of her harassers . . . and SHE was given a verbal warning.  While she was cooking a meal, Dennis had turned up the oven and her lasagna burned.  It was an oven Godbout was using, not Dennis.  There is no good reason for Dennis to change the temperature on someone else's meal, let alone to the point it burns.  Godbout should be able to raise that issue with management.  She doesn't have to be called split-tail or carpet muncher to be harassed.

78.     On Sept. 9, 2013, Godbout was given a warning after a long meeting laying her out for allegedly using some candy bars from the concession stand.  Linda Dyer had left some wrappers from the concession stand in the trash and Thompson accused Godbout of taking them and using them in a frosting for the Center.  No one ever bothered to interview Linda Dyer to find out if Thompson's unfounded assumption had any truth to it.  In a bizarre and lengthy meeting, Godbout is repeatedly criticized for using some candy bars in a frosting and told, "This is insubordination and is not acceptable."  In contrast, no such warning was given to Glover for calling her a crazy bitch or to Thompson for telling Godbout to eat at the Y or wanting to take her to her hairdresser to make her more girlie or to Matt Towle for throwing a box at Godbout.

79.     Linda Dyer said that *she* was the one who put the candy bar boxes in the trash, not Carol.  Carol was hauled into a lengthy meeting about misusing chocolate and was given a verbal warning for it – when it was Linda.

80.     Godbout was additionally warned by Thompson for telling her that she had been at work for 11 ½ hours without a break (which is not legal) and Thompson's discussion of the looks she thinks she got and how she thought Godbout was mad at her and how Godbout "seemed to move some trays around."

81.     On Friday Sept. 13, 2013, Carol and Dennis DeConzo were called in to the Kitchen Director's office to discuss issues of morale and productivity.  Tracy Thompson stated that it was a verbal warning with more serious actions to follow if behaviors did not change. Carol wrote a rebuttal letter.

82.     On Sept. 19, 2013, Dr. Naaz took Godbout out of work because her IBS had flared to an uncontrollable state after the "verbal" warning (meeting) about the chocolate chips and the stress caused by the absurdity of the accusation and the failure of the City to investigate, instead.  In Oct. 2013, provider Barbara Cameron-Cummings requested an extension of that medical leave.  Godbout returned to work Dec.1, 2013.

83.     On Sept. 24, 2013, Godbout had to go to HR to fill out insurance papers.  Kristy Gould said to her, "I understand Carol, I know about mental conditions, my son is manic depressant and I know how real things are up here (pointing to her head) when you have this condition."

84.     Despite Godbout's reports, the harassment and retaliation continued.  For example, in December 2013, the Center had basketball scheduled.  Godbout worked alone Thursday and prepared hot dishes, etc., for the concessions (Fri.-Sat.).   She would be senior these two days with Denis (FT) and Doug (PT) cooks.  As this made her in charge of the kitchen

for this function she must decide what to prepare, etc.  She left a note for Dennis (SOP) of what to do, as he was the early cook and she came in at 10 a.m.  Dennis first ignored her written instructions and then, when she arrived, was openly insubordinate and refused to prepare the food that she had planned.  After lunchtime had passed, Godbout ask him to make Italians but he wandered off to the dish room for 45 minutes.

85.     Godbout reported this treatment to Tracy Thompson.  Thompson grinned and then chuckled and handed Godbout an EAP brochure and said call them before you shoot him!  Godbout responded that this wasn't funny, and she needed support.  Thompson then suggested Godbout should try hugging it out with him.

86.     At this point Godbout asked Thompson to schedule him with Matt, and Doug with Godbout because it was just too stressful.  Thompson again grinned and said "are you saying you don't want to work with him?"

87.     Godbout made multiple reports, including one to HR in February 2014.

## COUNT I
## Title VII gender discrimination

88.     Godbout realleges and incorporates by reference the allegations set forth in the paragraphs above.

89.     Defendant's treatment of Godbout was and still is based on her gender.

90.     Godbout's work conditions and work assignments were often determined by gender.  Godbout was also routinely subjected to vile, offensive, threatening, and pervasive sexual harassment, directed at her because of her status as a female commercial cook.

91.     That harassment created an intimidating, hostile, and offensive working environment.  A reasonable person in Godbout's position would have found the harassment to be hostile and abusive and Godbout experienced it as such.

92.     Although Godbout repeatedly reported the sexually harassing conduct and

unequal treatment based on gender to defendant, defendant failed to exercise reasonable care to prevent and promptly correct that conduct.  Defendants failed to take the gender discrimination seriously enough to take any action that would stop it.

93.     Godbout reported the harassment to persons employed in managerial capacities and who were acting within the scope of their employment.  Defendant ratified and approved of the failure to take any remedial action against the discriminatory conduct.

94.     As a result of the discriminatory treatment described above, Godbout suffered damages.

95.     Defendant acted with malice and with reckless indifference to the protected civil rights of Godbout.  Defendant was motivated by discriminatory intent.

96.     Defendant discriminated against Godbout in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

## COUNT II
### Title VII retaliation

97.     Godbout realleges and incorporates by reference the allegations set forth in the paragraphs above.

98.     Defendant discriminated against Godbout because she opposed unlawful employment practices at the City and because she made charges of discrimination and participated in investigations of those charges.

99.     The actions of the defendant violated 42 U.S.C. § 2000e-3(a).

100.     Godbout was harmed by those actions.

101.     Defendant was well aware of the illegality of its conduct yet repeated – with reckless indifference and malice – its retaliatory conduct.

20

## <u>COUNT III</u>
### Maine Human Rights Act gender discrimination

102.    Godbout realleges and incorporates by reference the allegations set forth in the paragraphs above.

103.    The treatment of Godbout as part of her employment with the City of Augusta was based on gender and constituted unwelcome sexual harassment.  Plaintiff's work conditions and work assignments were often determined by gender.

104.    That harassment created an intimidating, hostile, and offensive working environment.  A reasonable person in plaintiff's position would have found the discriminatory environment to be hostile and abusive and plaintiffs experienced it as such.

105.    Although Godbout repeatedly reported the discriminatory conduct to defendant, defendant failed to exercise reasonable care to prevent and promptly correct that conduct. Defendant failed to take the gender discrimination seriously enough to take any action that would stop it.

106.    To date, defendant has taken no remedial action in response to complaints made by Godbout.  To the extent the defendant claims it has allowed some of the harassers to retire, the responses were neither prompt nor appropriate.

107.    Godbout reported the harassment to persons employed in managerial capacities and who were acting within the scope of their employment.  Defendant ratified and approved of the failure to take any effective remedial action.

108.    As a result of the discriminatory treatment, Godbout suffered damages.

109.    Defendant acted with malice and reckless indifference to Godbout's protected civil rights.  Defendant was motivated by discriminatory intent.

110.    Defendant discriminated against plaintiff in violation of the Maine Human Rights Act, 5 M.R.S.A. § 4572.

## COUNT IV
### Maine Human Rights Act sexual orientation discrimination

111.   Godbout realleges and incorporates by reference the allegations set forth in the paragraphs above.

112.   The treatment of Godbout as part of her employment by the City of Augusta was based on her sexual orientation and constituted unwelcome harassment.  Plaintiff's work conditions were often determined by her orientation as well as gender and the City's stereotypes about women and feminity.

113.   That harassment created an intimidating, hostile, and offensive working environment.  A reasonable person in plaintiff's position would have found the discriminatory environment to be hostile and abusive and plaintiff experienced it as such.

114.   Although Godbout and others repeatedly reported the discriminatory conduct to defendant, defendant failed to exercise reasonable care to prevent and promptly correct that conduct.  Defendant failed to take the gender discrimination seriously enough to take any action that would stop it.

115.   To date, defendant has taken no remedial action in response to complaints made by Godbout.  To the extent the defendant claims it has allowed some of the harassers to retire, the responses were neither prompt nor appropriate.

116.   Godbout and others reported the harassment to persons employed in managerial capacities and who were acting within the scope of their employment.  Defendant ratified and approved of the failure to take any effective remedial action.

117.   As a result of the discriminatory treatment, Godbout suffered damages.

118.   Defendant acted with malice and reckless indifference to Godbout's protected civil rights.  Defendant was motivated by discriminatory intent.

119.   Defendant discriminated against plaintiff in violation of the Maine Human Rights

Act, 5 M.R.S.A. § 4572.

## COUNT V
## Maine Human Rights Act retaliation

120.    Godbout realleges and incorporates by reference the allegations set forth in the

paragraphs above.

121.    Defendant discriminated against plaintiff because she opposed unlawful

employment practices at the City and because she made charges of discrimination and

participated in investigations of those charges.

122.    The actions of the defendant violated 5 M.R.S.A. § 4633.

123.    Plaintiff was harmed by those actions.

124.    Defendant was well aware of the illegality of its conduct yet repeated – with

reckless indifference and malice – its retaliatory conduct.

## COUNT VII
## Equal protection rights

125.    Godbout realleges and incorporates by reference the allegations set forth in the

paragraphs above.

126.    Defendant, while acting under the color of state law, violated the plaintiff's rights

of equal protection as guaranteed by the Fourteenth Amendment to the Constitution of the United

States of America, 42 U.S.C. § 1983, and Article I, sections 4 and 6-A of the Maine Constitution.

127.    The power of the City's Civic Center and City management was brought to bear

on Godbout because City officials harbored animosity toward women working as commercial

cooks.  Other persons identical in relevant ways, except by gender, were treated differently.

128.    The City of Augusta and its HR department and its City Manager have supported

the actions of the Civic Center, giving their imprimatur to the gender-biased policies and

departmental operations employed by the Augusta Civic Center.  The City's actions and inaction, and the conduct of its HR Department and City Manager, amounted to deliberate, callous, and reckless indifference to the constitutional rights of others and an affirmative link exists between that inaction and conduct and the constitutional violations alleged in this complaint.

129.    The violation of plaintiff's rights was the result of a final policy maker and the training, customs, and practices of the City of Augusta in its Civic Center and human resources departments.

130.    The conduct of defendant violated clearly established statutory and constitutional rights of which a reasonable person would have been aware.

131.    Defendant acted with malice toward Godbout.

132.    As a result of defendant's conduct, plaintiff Godbout has suffered and continues to suffer professional and personal injuries, including lost wages, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, chilling of constitutional and free speech rights, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Godbout prays that this Court enter an Order providing as follows:

A.    Enter judgment declaring that the defendant's practices complained of herein are unlawful as alleged;

B.    Grant Godbout a permanent injunction enjoining defendant, its officers, agents, successors, employees, attorneys and assigns and other representatives, and all persons acting in concert with it and at its direction, from engaging in any employment policy or practice which retaliates against Godbout;

24

C.      Order defendant to make Godbout whole by providing reinstatement and/or front pay, appropriate back pay, and reimbursement for lost pension, health, Social Security, and other benefits in amounts to be shown at trial;

D.      Order defendant to pay Godbout compensatory damages for non-pecuniary losses, including, but not limited to, pain and suffering, psychological upset, inconvenience, and interference with the enjoyment of life;

E.      Order defendant to pay Godbout civil penal damages pursuant to 5 M.R.S.A. § 4613(2)(B)(7);

F.      Order defendant to pay all litigation costs and expert witness fees;

G.      Order defendant to pay Godbout nominal damages;

H.      Order defendant to pay pre-judgment, post-judgment interest, and reasonable attorneys' fees to Godbout; and

I.      Grant such additional relief as this Court deems appropriate.


/s/ Rebecca S. Webber
_____
Rebecca S. Webber, Esq. (Bar No. 7908)
*Attorney for Plaintiff Carol Godbout*
SKELTON TAINTOR & ABBOTT
95 Main Street
Auburn, ME 04210
(207) 784-3200
rwebber@sta-law.com


Date:  August 5, 2015